set forth in 40 C.F.R. § 63.6(e)(3) and incorporated into the HON.

33.    <u>Planned and Unplanned Oxy Incinerator Outages</u>.  Westlake has identified the

Oxy Absorber as a recovery device which is used to comply with the requirements of 40 C.F.R. §

63.113(a).  Westlake has demonstrated that the Oxy Absorber Vent meets the HON definition of

a Group 2 process vent, as long as the Oxy Absorber operating parameters are monitored and

maintained pursuant to 40 C.F.R. § 63.114(a), at the levels established during the Group 2

process vent demonstration.  During all Oxy Incinerator outages occurring during the effective

period of this Paragraph, Westlake shall maintain the Oxy Absorber Vent as a HON Group 2

process vent.  For a period of three (3) years commencing on the Effective Date of this Consent

Decree, Westlake shall comply with the following requirements:

         a.      <u>Planned Oxy Incinerator Outages</u>.

             1.       During all planned Oxy Incinerator outages, the Oxy Absorber

shall remain in operation unless the Oxy Absorber experiences a malfunction, as defined in 40

C.F.R. Part 63, during the planned Oxy Incinerator outage.  During all planned Oxy Incinerator

outages, Westlake shall maintain the Oxy Absorber Vent as a HON Group 2 process vent, and

divert at least 40 percent, and more, if practicable, (determined on a three hour rolling average)

by volume of the Oxy Absorber Vent flow to the Primary Incinerator until the Oxy Incinerator is

restarted.  To verify that at least 40 percent by volume of the Oxy Absorber Vent flow rate is

diverted to the Primary Incinerator, Westlake shall continuously monitor and record the total

volumetric flow rate exiting the Oxy Absorber Vent; continuously monitor and record the

volumetric flow rate that is diverted from the Oxy Incinerator to the Primary Incinerator; and

determine the average volumetric flow rate for each consecutive sixty (60) minute period

beginning at the time the Oxy Absorber Vent begins to be transitioned to the Primary Incinerator.

2.      Westlake's failure to divert at least 40 percent by volume on average during each rolling three hour period while the Oxy Incinerator is down during a planned outage shall be considered a violation of the Consent Decree unless the Primary Incinerator or the Oxy Absorber Vent experiences a malfunction, as defined in 40 C.F.R. Part 63, during the planned Oxy Incinerator outage.  In the event that there is a simultaneous malfunction of the Primary Incinerator or the Oxy Absorber Vent during the planned Oxy Incinerator outage, Westlake shall comply with all applicable requirements of 40 C.F.R. Part 63, Subparts A, F, G, and H, including the implementation of measures to prevent or minimize excess emissions to the extent practical minimize emissions as set forth in 40 C.F.R. § 63.102.

3.      Sixty (60) days, or as soon as practicable, prior to any planned Oxy Incinerator outage, Westlake shall submit to EPA and the Commonwealth written notification of the planned outage.  The notification should include the duration of the planned outage and the purpose for the planned outage.

b.      Unplanned Oxy Incinerator Outages.

1.      In order to minimize possible Primary Incinerator process upsets/trips during unplanned Oxy Incinerator outages, Westlake shall maintain the Oxy Absorber Vent as a HON Group 2 process vent.  Westlake shall be allowed a transition period during the unplanned Oxy Incinerator Outage not to exceed a sixty (60) minutes.  During this initial sixty (60) minute transition period, Westlake must transfer as much as practicable of the Oxy Absorber Vent flow into the Primary Incinerator during the transition period.  After the sixty (60) minute transition period, Westlake shall divert at least 40 percent flow by volume

—34—

(determined on a three hour rolling average), and more, if it is practicable, of the Oxy Absorber

Vent flow to the Primary Incinerator until the Oxy Incinerator is restarted. If the unplanned

outage is less than three (3) hours in duration, then Westlake shall maintain the 40 percent flow

by volume diversion based on a thirty (30) minute average. To verify that at least 40 percent by

volume of the Oxy Absorber Vent flow rate is diverted to the Primary Incinerator, Westlake

shall: continuously monitor and record the total volumetric flow rate exiting the Oxy Absorber

Vent; continuously monitor and record the volumetric flow rate that is diverted from the Oxy

Incinerator to the Primary Incinerator; determine the average volumetric flow rate for each

consecutive 60 minute period, following the sixty (60) minute transition period, at the time of the

Oxy Incinerator shutdown; and use the sixty (60) minute average data as calculated above to

determine the three hour rolling average.

      2.      In the event that there is a simultaneous malfunction of the Primary

Incinerator and the Oxy Incinerator or the Oxy Absorber Vent, Westlake shall comply with all

applicable requirements of 40 C.F.R. Part 63 Subparts A, F, G, and H, including the

implementation of measures to prevent or minimize excess emissions to the extent practical

minimize emissions as set forth in 40 C.F.R. § 63.102. If the Oxy Incinerator is still down when

the Primary Incinerator is restarted, Westlake shall transfer as much as practicable of the Oxy

Absorber Vent flow into the Primary Incinerator. Within sixty (60) minutes after the Primary

Incinerator is restarted, Westlake shall divert at least 40 percent flow by volume (determined on a

three hour rolling average), and more, if it is practicable, of the Oxy Absorber Vent flow to the

Primary Incinerator until the Oxy Incinerator is restarted.

      3.      In the event that there is a simultaneous unplanned outage of the

–35–

Primary Incinerator, the Oxy Incinerator, and the Oxy Absorber Westlake shall comply with all applicable requirements of 40 C.F.R. Part 63, Subparts A, F, G, and H, including the implementation of measures to prevent or minimize excess emissions to the extent practical minimize emissions as set forth in 40 C.F.R. § 63.102.

    4.      Within sixty (60) days of any unplanned Oxy Incinerator outage occurring within three (3) years of the Effective Date of this Consent Decree, Westlake shall perform an evaluation of the unplanned outage. Westlake shall document the evaluation conducted, the determination made, and the corrective action taken. Where a maintenance related cause is identified, Westlake shall implement a preventative maintenance program to prevent another unplanned outage from the same cause. Within ten (10) days of identifying the cause of the unplanned outage, Westlake shall submit a report of the evaluation conducted, the determination made of the cause of the unplanned outage, the corrective action taken, the duration of the unplanned outage, and any preventative maintenance implemented to EPA and the Commonwealth. If a cause cannot be identified, then Westlake shall report all the information available. However, if additional information concerning the unplanned outage becomes available after the initial report has been submitted, Westlake shall submit the supplemental information. If an unplanned outage recurs from the same cause, and is above the reportable quantity, Westlake shall perform a root cause analysis. In situations where preventative maintenance can be identified to reduce or eliminate the recurrence of the unplanned outage, within ten (10) days of preparing the report of the preventative maintenance implemented, Westlake shall incorporate into the SSMP the evaluation and determination or root cause analysis and the preventative maintenance steps taken by Westlake.

## RCRA INJUNCTIVE RELIEF AT THE PVC PLANT

34.     _Sampling and Integrity Workplan and Report for Lift Stations 4, 7, and 9 at the PVC Plant._  Within sixty (60) days after EPA's approval of Westlake's contractor/consultant pursuant to this Consent Decree, Westlake shall submit to EPA for review and approval, a Sampling and Integrity Workplan for Lift Station Nos. 4, 7, and 9 (Lifts 4, 7, 9) at the PVC Plant that shall include the following to the extent it is available:

a.      A detailed history of the usage of Lifts 4, 7, and 9 by Westlake from the date on which each Lift was constructed through the lodging of this Consent Decree, including, but not limited to, the types of materials managed in each Lift, the source of those materials and the areas to which those materials were discharged;

b.      A technical description explaining how Lifts 4, 7, and 9 were constructed, including all maps, diagrams, as-built drawings, and other construction documents detailing how the Lifts were constructed;

c.      A description of all hazardous waste and/or hazardous constituents managed in Lifts 4, 7, and 9 and the dates on which the hazardous waste and/or hazardous constituents were, or may have been, managed in each Lift;

d.      A description of the sampling and analysis to evaluate releases (e.g., soil, surface water, groundwater, and sediment), potential releases, release pathways, and receptors, associated with each Lift;

e.      A description of the sampling and analysis, or other method, to evaluate background levels associated with each medium (e.g. soil, surface water, groundwater,

–37–

sediment).

    f.  Procedures that Westlake will follow to sample all streams exiting the PVC Plant in route to the neighboring Air Products Plant;

    g.  Procedures that Westlake will follow to evaluate the structural integrity of Lifts 4, 7, and 9 to ensure that each is not leaking or that leaking is not imminent; and

    h.  A schedule for initiation and completion of the work required pursuant to the Sampling and Integrity Workplan.

   35.  All sampling conducted by Westlake shall conform to applicable provisions of EPA's Requirements for Quality Assurance set forth in Section VII (Quality Assurance) of this Consent Decree.

   36.  Within thirty (30) days of Westlake's receipt of approval from EPA of the Sampling and Integrity Workplan, Westlake shall implement the Sampling and Integrity Workplan in accordance with the schedule contained therein.

   37.  In accordance with the schedule contained in the Sampling and Integrity Workplan, Westlake shall submit to EPA for review and approval, a report setting forth the results from the implementation of the Sampling and Integrity Workplan ("Sampling and Integrity Report"). The Sampling and Integrity Report shall include, but not be limited to, the following:

    a.  A summary of all sampling conducted by Westlake as required by the Sampling and Integrity Workplan, including maps drawn to scale and/or aerial GPS maps that identify all sampling locations for soil, sediment, groundwater, and surface water, as well as the analytical results for each sample taken at each sampling location;

—38—

b.      An evaluation of the analytical results for each Lift, to include:

    i.      a summary of concentrations found in relation to EPA Regional Screening Levels (available at http://www.epa.gov/reg3hwmd/risk/human/rb-concentration_table/Generic_Tables/index.htm); and EPA ecological screening values (available at http://epa.gov/region4/waste/ots/ecolbul.htm#ecoscreen);

    ii.      identification of pollution migration pathways (soil, sediment, surface water, groundwater, air, subsurface gas); and

    iii.      identification of potential/actual receptors (human and ecological);

c.      A recommendation for: no further action (NFA); interim measures (IM); a RCRA Facility Investigation (RFI); or the collection of additional confirmatory sampling data to make a NFA/IM/RFI determination for each Lift based on the evaluation of the analytical results for each Lift;

d.      A certified report from a licensed professional engineer (P.E.) stating the current structural integrity of the Lifts, the expected lifetime of the Lifts to function as designed, and a recommendation of the future structural integrity assessment that shall be conducted on the Lifts to assess whether each Lift continues to be fit to withstand the service conditions safely and is reliable;

e.      Proposed repairs or other actions that are necessary based upon the the current structural integrity of the Lifts, including a proposed schedule for making the proposed repairs or conducting any other actions identified; and

f.      All documents or information that Westlake relied upon to propose such

–39–

repairs or other actions in Paragraph (e) above.

38.     Interim Measures (IM) Stabilization at the PVC Plant for Lifts 4, 7, 8, and 9.

a.      In the event that Westlake identifies an immediate threat to human health and/or the environment emanating from Lifts 4, 7, 8, and 9 at the PVC Plant during the performance of the requirements set forth in this Consent Decree that is not already being addressed under another state or federal program such as RCRA or CERCLA, or discovers previously unidentified and unreported pre-existing releases of hazardous waste above established reportable quantity thresholds emanating from Lifts 4, 7, 8, and 9 at the PVC Plant during the performance of the requirements set forth in this Consent Decree, Westlake shall notify EPA as provided in the Notices Section of this Consent Decree orally within forty-eight (48) hours of discovery and in writing within three (3) working days of such discovery summarizing the immediacy and/or magnitude of the releases and potential threat(s) to human health and/or the environment.  Within thirty (30) days of notifying EPA, Westlake shall submit to EPA for approval an Interim Measures Stabilization Workplan (IM Workplan) for activities required to mitigate the immediate threat to human health and/or the environment in accordance with the IM Scope of Work (Appendix D).  If EPA determines that immediate action is required, EPA may orally authorize Westlake to act prior to EPA's receipt of the IM Workplan.  Westlake may also implement a conditional or final remedy as an Interim Measure to address human exposure and groundwater migration.

b.      If EPA identifies an immediate threat to human health and/or the environment emanating from Lifts 4, 7, 8, and 9 at the PVC Plant during the performance of the requirements set forth in this Consent Decree that is not already being addressed under another

—40—

state or federal program such as RCRA or CERCLA, EPA will notify Westlake in writing.

Within thirty (30) days of receiving EPA's written notification, Westlake shall submit to EPA for

approval an IM Workplan in accordance with the IM Scope of Work (Appendix D), which

identifies interim measures which will mitigate the threat. If EPA determines that immediate

action is required, EPA may orally require Westlake to act prior to Westlake's receipt of EPA's

written notification.

        c.    All IM Workplans shall ensure that the measures are designed to mitigate

immediate threat(s) to human health and/or the environment, and should be consistent with the

objectives of, and contribute to the performance of the appropriate long term remedy, which may

be required at the PVC Plant.

        d.    In accordance with Appendix D herein, an IM Workplan shall include the

following sections:

        i.    Interim Measures Objectives;

        ii.    Health and Safety Plan;

        iii.    Data Collection Quality Assurance Plan;

        iv.    Data Management Plan;

        v.    Groundwater Assessment Plan; and

        vi.    Community Relations Plan.

39.    RCRA Facility Investigation (RFI).  In the event that EPA makes a determination

based upon the Sampling and Integrity Report that an RFI is necessary for Lifts 4, 7, and/or 9,

Westlake shall submit, within ninety (90) days of EPA's determination that an RFI is necessary, a

Workplan for an RFI for Lifts 4, 7 and/or 9 to accurately characterize the nature, extent,

direction, rate, movement, and concentration of any release of hazardous waste and/or hazardous constituents at or from the Lift(s) from which the release has occurred, necessary to determine potential risks to human health and the environment and to support development and implementation of Corrective Measures should they prove necessary. The RFI Workplan for Lifts 4, 7, and/or 9 shall comply with Appendix F, and EPA shall notify Westlake in writing of EPA's approval/disapproval, or modification of the RFI Workplan, in accordance with this Consent Decree.

40.    <u>Lift Station # 8</u>.  Within ninety (90) days after EPA's approval of Westlake's contractor/consultant pursuant to this Consent Decree, Westlake shall submit to EPA for review and approval an RFI Workplan for Lift 8 (RFI Workplan for Lift 8) to accurately characterize the nature, extent, direction, rate, movement, and concentration of any release of hazardous waste and/or hazardous constituents at or from Lift 8, necessary to determine potential risks to human health and the environment and to support development and implementation of Corrective Measures should they prove necessary. The RFI Workplan for Lift 8 shall comply with Appendix F, and EPA shall notify Westlake in writing of EPA's approval/disapproval, or modification in accordance with this Consent Decree.

41.    <u>RFI Workplan(s) for Lifts 4, 7 and/or 9 and 8</u>.  Any RFI Workplan developed pursuant to this Consent Decree shall be designed to define the presence, magnitude, extent, direction, and rate of movement of any hazardous waste and/or hazardous constituents within and beyond the PVC Plant boundary which have been or are being released from the Lifts. The RFI Workplan shall document the procedures to be used to conduct those investigations necessary to:

a       Characterize the sources(s) of contamination;

—42—

b.      Determine the nature, extent and the rate of movement of hazardous waste and/or hazardous constituents;

c.      Determine the possible routes of migration of hazardous waste and/or hazardous constituents on and off the PVC Plant, including characterization of the geology and hydrology of the PVC Plant, which delineates possible routes of migration;

d.      Determine the extent and potential for migration of hazardous waste and/or hazardous constituents through each of the environmental media;

e.      Identify actual or potential receptors; and

f.      Develop alternative options from which EPA will select Corrective Measures to remediate the observed and potential contamination.  The RFI Workplan shall include a specific schedule for implementation of all activities described in the RFI Workplan.

42.     In accordance with the provisions of Appendix F, an RFI Workplan developed pursuant to this Consent Decree shall include the following sections:

a.      Project Management Plan, which includes a schedule for implementation of the Workplan, including the preparation and submission of preliminary and final Reports to EPA;

b.      Data Collection Quality Assurance;

c.      Data Management; and

d.      Public Involvement Plan.

43.     If an RFI Workplan is required for Lifts 4, 7, and/or 9, Westlake may submit a RFI Workplan that includes one or more Lifts in a single Workplan, or Westlake may submit to EPA an RFI Workplan for each Lift.  For Lift 8, Westlake shall submit an RFI Workplan that

–43–

only addresses Lift 8.

44.   <u>Health and Safety Plan</u>.  Contemporaneous with Westlake's submission of an RFI

Workplan for Lift 8 to EPA, Westlake shall submit to EPA a Health and Safety Plan in

accordance with Appendix I of this Consent Decree.  If Westlake is required to submit

Workplans for both an IM and for the RFI Workplan for Lift 8, Westlake may submit a single

Health and Safety Plan that addresses the combined IM and RFI activities.  If Westlake is

subsequently required to submit an RFI Workplan for Lifts 4, 7, and/or 9, Westlake may amend

the existing Health and Safety Plan to address the additional RFI activities for each Lift.

45.   <u>Public Involvement Plan</u>.  Westlake shall submit to EPA a Public Involvement

Plan as part of each RFI Workplan.  The Public Involvement Plan shall, at a minimum, include

an assessment of community concerns, development of a Fact Sheet, and development of a

mailing list.  The Fact Sheet shall summarize the current or proposed corrective action activities

and shall be updated, as necessary.  All fact sheets should be reviewed by EPA prior to public

distribution.  Westlake shall maintain an easily accessible repository (such as a town hall or

public library) of information, including the Consent Decree, approved Workplan(s), and

report(s).

46.   <u>Implementation of RFI Workplan(s)</u>.  Westlake shall begin implementation of

each RFI Workplan(s) submitted to EPA within thirty (30) days of EPA's approval of each RFI

Workplan.

47.   <u>RFI Report(s)</u>.  Westlake shall submit a RFI Report to EPA for approval in

accordance with each EPA approved RFI Workplan schedule.  EPA will review the RFI Report

for each Lift and notify Westlake in writing of EPA's approval/disapproval, or modification in

accordance with this Consent Decree.

48.   <u>CMS Workplan(s)</u>.   Within one hundred twenty (120) days of EPA's approval of

RFI Report(s) and if Corrective Measures have been determined to be appropriate, Westlake shall

submit a Corrective Measures Study (CMS) Workplan(s) to EPA that addresses the Lifts for

which Corrective Measures are appropriate. Each CMS Workplan shall be developed in a

manner consistent with the CMS Scope of Work contained in Appendix C to this Consent

Decree.   EPA will review each CMS Workplan and notify Westlake in writing of EPA's

approval/disapproval, or modification in accordance with this Consent Decree.   Westlake shall

begin implementing each CMS Workplan(s) within thirty (30) days of EPA's approval of each

CMS Workplan.

a.      Each CMS Workplan submitted to EPA shall provide, at a minimum, the

following information:

i.      A description of the general approach to the CMS and potential

receptors;

ii.     A statement of the overall objectives of the study;

iii.    The specific plans for evaluating remedies to ensure compliance

with the appropriate media cleanup standards at the point of compliance;

iv.     The proposed format for the presentation of information;

v.      A justification for each corrective measure that Westlake

proposes to study to achieve the appropriate media cleanup standards;

vi.     A description of the methodology for developing and evaluating

potential corrective measures;

       vii.    Identify any innovative technologies that may be used for the containment, treatment, and/or disposal; and

       viii.    Project Schedule.

      b.    Westlake shall conduct treatability studies for all potential corrective measures that involve treatment except where Westlake can demonstrate to EPA's satisfaction that they are not needed. Each CMS Workplan shall include a summary of the proposed treatability study and conceptual design, and a schedule for submittal of the treatability study Workplan or Westlake's justification for not proposing a treatability study.

     49.    Concurrently with the submission of each CMS Workplan, Westlake shall submit to EPA, a Health and Safety Plan in accordance with Appendix I. If Health and Safety Plans are required for RFI(s), and CMS(s), Westlake may submit a revised Health and Safety Plan that addresses the PVC Plant's situation following the IM and RFI activities.

     50.    <u>Implementation of CMS Workplan(s)</u>.  Westlake shall begin implementation of each CMS Workplan(s) submitted to EPA within thirty (30) days of EPA's approval of each CMS Workplan.

     51.    <u>CMS Report(s)</u>.  Westlake shall submit each CMS Report to EPA for approval in accordance with the EPA approved CMS Workplan schedule. Each CMS Report shall contain, at a minimum, the following information for each corrective measure studied:

      a.    An evaluation of any treatability studies performed;

      b.    An evaluation of the overall protectiveness of human health and the environment;

      c.    An evaluation of the ability to attain the appropriate media cleanup

standards at the points of compliance;

    d.    An evaluation of the ability to control the sources of the releases;

    e.    An estimate and analysis of quantity, volume, and/or toxicity of the waste generated, including, but not limited to, contaminated soil, sludge, and groundwater;

    f.    An evaluation of methods to minimize the volume, toxicity, and/or mobility of waste to be generated;

    g.    An assessment of how institutional and legal requirements including federal, state, or local environmental or public health standards, regulations, and/or ordinances will affect the design, operation, and timing of each corrective action alternative;

    h.    An assessment of short-term and long-term reliability and effectiveness, including, but not limited to, the methodology used to estimate short-term and long-term reduction of toxicity, mobility, or volume of waste and the resulting estimate;

    i.    An evaluation of the ease of implementation;

    j.    An estimate of the cost, including capital and annual operation and maintenance costs; and

    k.    A recommendation as to which corrective measures, in Westlake's opinion, are the most appropriate and the rationale for such recommendations.

52.    Westlake shall submit a CMS Report to EPA in accordance with the EPA approved CMS Workplan(s) schedule.  EPA shall review each CMS Report and notify Westlake of EPA's approval, disapproval or modification, modification as provided in this Consent Decree.

53.    The Administrative Record supporting the selection of the Corrective Measures will be available for public review at United States Environmental Protection Agency, Region 4

–47–

61 Forsyth Street Atlanta, Georgia 30303.

54.     EPA will provide the public with an opportunity to submit written and/or oral comments and an opportunity for a public meeting regarding EPA's proposed cleanup standards and remedy for the PVC Plant.

55.     Following the public comment period, EPA will notify Westlake of which Corrective Measures are selected, if any. If the corrective measure recommended in each CMS Report is not the Corrective Measures selected by EPA after consideration of public comments, EPA will inform Westlake in writing of the reasons for such decision and Westlake shall modify the CMS Report(s) as directed to do so by EPA.

56.     Corrective Measures Implementation (CMI).  Within one hundred twenty (120) days of Westlake's receipt of notification by EPA of the selection of the Corrective Measures, based upon each CMS Report, Westlake shall submit to EPA, a Corrective Measures Implementation Workplan ("CMI Workplan"). Each CMI Workplan shall be developed in a manner consistent with the CMI Scope of Work incorporated herein and contained in Appendix B of this Consent Decree. EPA will review each CMI Workplan and notify Westlake in writing of EPA's approval/disapproval, or modification in accordance with this Consent Decree.

a.     Each CMI Workplan shall be designed to facilitate the design, construction, operation, maintenance, and monitoring of Corrective Measures at the PVC Plant for each specific RFI Report. In accordance with Appendix B herein, each CMI Workplan shall also include the following sections:

i.     Program Management;

ii.    Public Involvement Plan;

—48—

  iii.  Design Plans and Specifications;

  iv.  Operation and Maintenance;

  v.   Cost Estimate;

  vi.  Project Schedule;

  vii.  Construction Quality Assurance;

  viii.  Data Collection Quality Assurance; and

  ix.  Data Management.

57.  Concurrent with the submission of each CMI Workplan, Westlake shall submit to EPA a CMI Health and Safety Plan in accordance with Appendix I of this Consent Decree.

58.  Westlake shall fully implement each CMI Workplan as approved by EPA and according to the approved CMI Workplan and Schedule.

59.  The corrective action conditions of this Consent Decree apply to all previously unaddressed releases, discharges, or disposals of hazardous waste or hazardous constituents, except for releases that are being addressed under another state or federal program such as RCRA or CERCLA, from Lifts 4, 7, 8, or 9 that are discovered during the course of groundwater monitoring or field investigations conducted as part of this Consent Decree. "Discovery" or "discovered" means that Westlake or EPA physically observes evidence or receives information which suggests the presence of an unaddressed release, discharge or disposal of hazardous constituents to the environment. Westlake shall notify EPA in writing within fifteen (15) calendar days of its discovery of any unaddressed release, discharge or disposal of hazardous waste or hazardous constituents to the environment. The notification shall include, at a minimum, the location of the release, discharge or disposal, and all available information

–49–

pertaining to the nature and magnitude of the release, discharge or disposal. EPA may require that Westlake conduct further assessment (i.e., Confirmatory Sampling) pursuant to this Consent Decree, to determine the status of the suspected release, discharge or disposal. Confirmatory Sampling will not be required under this paragraph if the release, discharge or disposal is being addressed by another state or federal program such as RCRA or CERCLA.

     60.    Estimated Cost of the RCRA Corrective Measures Work. In the event that Corrective Measures are required with regard to Lifts 4, 7, 9 and/ or 8, within thirty (30) days after EPA selects the of Corrective Measures to be implemented for Lifts 4, 7, 9 and/or 8, Westlake shall submit to EPA for review and approval, a detailed written estimate, in current dollars, of the cost of hiring a third party to perform the Corrective Measures for Lifts 4, 7, 9, and/or 8 (hereinafter, the "Estimated Cost of the RCRA Corrective Measures Work"). The Estimated Cost of the RCRA Corrective Measures Work shall account for the total cost of the covered work activities as set forth in each CMS Report, including any necessary long term costs, such as operation and maintenance costs and monitoring costs, any "Interim Measures/Stabilization" that may be required, the "Corrective Measures Implementation", any Additional Work as described herein and as required by the Scopes of Work in Appendices A-I to perform the Corrective Measures. A third party is a party who (i) is neither a parent nor a subsidiary of Westlake and (ii) does not share a common parent or subsidiary with Westlake. The cost estimates shall not incorporate any salvage value that may be realized from the sale of wastes, facility structures or equipment, land or other assets associated with the facility.

     61.    Westlake shall annually adjust the Estimated Cost of the RCRA Corrective Measures Work for inflation within thirty (30) days after the close of Westlake's fiscal year until

the work required by the CMS Report is completed.  In addition, Westlake shall adjust the Estimated Cost of the RCRA Corrective Measures Work if EPA determines that any additional work is required, or if any other condition increases the cost of the obligations to be performed under this Consent Decree.

62.     Westlake shall submit each adjusted Estimated Cost of the RCRA Corrective Measures Work to EPA for review.  EPA will review each cost estimate and notify Westlake in writing of EPA's approval, disapproval, or modification of the cost estimate.

63.     <u>Assurances of Financial Responsibility for Completing the RCRA Corrective Measures Work</u>.  Concurrently with the submission of each Estimated Cost of the RCRA Corrective Measures Work, Westlake shall submit draft financial assurance instruments and related documents to EPA, for EPA's review and approval as set forth herein.  Within ten (10) days after EPA's approval of both the initial Estimated Cost of the RCRA Corrective Measures Work, and the form of the draft financial assurance instruments, Westlake shall execute or otherwise finalize all instruments or other documents required in the Consent Decree to make the selected financial assurance legally binding in a form substantially identical to the financial assurance documents reviewed and approved by EPA.  Westlake shall submit all executed and/or otherwise finalized instruments or other documents to EPA within thirty (30) days after EPA's approval of the initial Estimated Cost of the RCRA Corrective Measures Work and the draft financial assurance instruments.

64.     In order to secure the full and final completion of the work in accordance with this Consent Decree, Westlake shall establish and maintain financial assurance for the benefit of the EPA in the amount of the most recent Estimated Cost of the Work.  Westlake may use one or

more of the financial assurance forms generally described in Paragraphs a - f below.  Any and all

financial assurance instruments provided pursuant to this Consent Decree shall be satisfactory in

form and substance as determined by EPA.  The financial assurance forms shall generally follow

the wording of the forms as set forth in 40 C.F.R. § 264.151 with appropriate modifications to

reflect the work to be conducted under this Consent Decree.  Westlake shall have the discretion

of determining which financial assurance mechanism set forth below that it will follow.

      a.     A trust fund established for the benefit of EPA, administered by a trustee

who has the authority to act as a trustee under Federal or State law and whose trust operations are

regulated and examined by a Federal or State agency, and that is acceptable in all respects to the

EPA.  The trust agreement shall provide that the trustee shall make payments from the fund as

the EPA Region 4 Regional Administrator shall direct in writing (1) to reimburse Westlake from

the fund for expenditures made by Westlake for RCRA Corrective Measures Work performed in

accordance with this Consent Decree, or (2) to pay any other person whom the Region 4

Regional Administrator determines has performed or will perform the RCRA Corrective

Measures Work in accordance with this Consent Decree.  The trust agreement shall further

provide that the trustee shall not refund to the grantor any amounts from the fund unless and until

EPA has advised the trustee that the RCRA Corrective Measures Work under this Consent

Decree has been successfully completed.

      b.     A surety bond unconditionally guaranteeing performance of the RCRA

Corrective Measures Work in accordance with this Consent Decree, or guaranteeing payment at

the direction of Region 4 Regional Administrator into a standby trust fund that meets the

requirements of the trust fund herein.  The surety company issuing the bond shall, at a minimum,

be among those listed as acceptable sureties on Federal Bonds as set forth in Circular 570 of U.S. Department of the Treasury.

        c.     An irrevocable letter of credit, payable at the direction of the Region 4 Regional Administrator, into a standby trust fund that meets the requirements of the trust fund in Paragraph a above. The letter of credit shall be issued by a financial institution (i) that has the authority to issue letters of credit, and (ii) whose letter-of-credit operations are regulated and examined by a Federal or State agency.

        d.     A policy of insurance that (i) provides EPA with beneficiary rights acceptable to EPA; and (ii) is issued by an insurance carrier that (a) has the authority to issue insurance policies in the applicable jurisdiction(s), and (b) whose insurance operations are regulated and examined by a Federal or State agency. The insurance policy shall be issued for a face amount at least equal to the current Estimated Cost of the RCRA Corrective Measures Work to be performed under this Consent Decree, except where costs not covered by the insurance policy are covered by another financial assurance instrument, as permitted herein. The policy shall provide that the insurer shall make payments as the Region 4 Regional Administrator shall direct in writing (i) to reimburse Westlake for expenditures made by Westlake for RCRA Corrective Measures Work performed in accordance with this Consent Decree, or (ii) to pay any other person whom the Region 4 Regional Administrator determines has performed or will perform the RCRA Corrective Measures Work in accordance with this Consent Decree, up to an amount equal to the face amount of the policy. The policy shall also provide that it may not be canceled, terminated or non-renewed and the policy shall remain in full force and effect in the event that (i) Westlake is named as a debtor in a voluntary or involuntary proceeding under Title

—53—

11 (Bankruptcy), U.S. Code; or (ii) EPA notifies the insurer of Westlake's failure to perform, under of this section.

    e.    A corporate guarantee, executed in favor of the EPA by one or more of the following: (i) a direct or indirect parent company, or (ii) a company that has a "substantial business relationship" with Westlake (as defined in 40 C.F.R. § 264.141(h)), to perform the RCRA Corrective Measures Work in accordance with this Consent Decree or to establish a trust fund as permitted by Paragraph a above; provided, however, that any company providing such a guarantee shall demonstrate to the satisfaction of the EPA that it satisfies the financial test requirements of 40 C.F.R. § 264.143(f) with respect to the Estimated Cost of the RCRA Corrective Measures Work that it proposes to guarantee; or

    f.    A demonstration by Westlake that Westlake meets the financial test criteria of 40 C.F.R. § 264.143(f) with respect to the Estimated Cost of the RCRA Corrective Measures Work, provided that all other requirements of 40 C.F.R. § 264.143(f) are satisfied.

    65.    If Westlake seeks to establish financial assurance by using a surety bond, a letter of credit, or a corporate guarantee, Westlake shall at the same time establish, and thereafter maintain, a standby trust fund, which meets the requirements relating thereto above, into which funds from the other financial assurance instrument can be deposited, if the financial assurance provider is directed to do so by EPA.

    66.    Westlake shall submit all financial assurance instruments and related required documents by certified mail to the EPA Region 4 Superfund/RCRA Records Management Officer, with copies to the Regional Financial Assurance Officer:

–54–

Debbie Jourdan
EPA Region 4 Superfund/RCRA Records Management Officer
Region 4 Superfund Division, 11th Floor
United States Environmental Protection Agency
61 Forsyth Street, S.W.
Atlanta, GA 30303

Bob Stewart
EPA Regional Financial Assurance Officer
Region 4 RCRA Division-ROEC Branch, 10th Floor
United States Environmental Protection Agency
61 Forsyth Street, S.W.
Atlanta, GA 30303

67.     If at any time during the effective period of this Consent Decree Westlake provides financial assurance for completion of the RCRA Corrective Measures Work by means of a corporate guarantee or financial test, Westlake shall also comply with the other relevant requirements of 40 C.F.R. § 264.143(f), 40 C.F.R. § 264.151(f), and 40 C.F.R. § 264.151(h)(1) relating to these methods, unless otherwise provided in this Consent Decree, including but not limited to, (i) initial submission of required financial reports and statements from the guarantors' chief financial officer and independent certified public accountant; (ii) annual re-submission of such reports and statements within ninety (90) days after the close of each of the guarantors' fiscal years; and (iii) notification of EPA within ninety (90) days after the close of any of the guarantors' fiscal years in which any such guarantor no longer satisfies the financial test requirements set forth at 40 C.F.R. Part 264.143(f)(1).  Westlake further agrees that if Westlake provides financial assurance by means of a corporate guarantee or financial test, EPA may request additional information (including financial statements and accountant's reports) from Westlake or corporate guarantor at any time.

68.     For purposes of the corporate guarantee or the financial test described

–55–

above, references in 40 C.F.R. § 264.143(f) to "the sum of current closure and post-closure costs and the current plugging and abandonment cost estimates" shall mean the sum of all environmental remediation obligations (including obligations under CERCLA, RCRA, UIC, TSCA and any other state or tribal environmental obligation) at the PVC Plant guaranteed by such company or for which such company is otherwise financially obligated in addition to the cost of the RCRA Corrective Measures Work to be performed in accordance with this Consent Decree.

69.     Westlake may combine more than one mechanism to demonstrate financial assurance for the RCRA Corrective Measures Work to be performed in accordance with this Consent Decree, except that surety bonds guaranteeing performance, financial tests and corporate guarantees may not be combined with other instruments.

70.     If at any time EPA determines that a financial assurance instrument provided pursuant to this Section is inadequate, or no longer satisfies the requirements set forth or incorporated by reference in the Section, whether due to an increase in the estimated cost of completing the RCRA Corrective Measures Work or for any other reason, EPA shall so notify Westlake in writing.  If at any time Westlake becomes aware of information indicating that any financial assurance instrument provided pursuant to this Section is inadequate or no longer satisfies the requirements set forth or incorporated by reference in the Section, whether due to an increase in the estimated cost of completing the RCRA Corrective Measures Work or for any other reason, then Westlake shall notify EPA in writing of such information within thirty (30) days.  Within thirty (30) days of receipt of notice of EPA's determination, or within thirty (30) days of Westlake's becoming aware of such information, as the case may be, Westlake shall

obtain and present to EPA for approval a proposal for a revised or alternative form of financial

assurance above that satisfies all requirements set forth or incorporated by reference in this

Section.  In seeking approval for a revised or alternative form of financial assurance, Westlake

shall follow the procedures set forth below in Paragraph 74.

71.    Westlake's inability or failure to establish or maintain financial assurance for

completion of the RCRA Corrective Measures Work shall in no way excuse performance of any

other requirements of this Consent Decree, including, without limitation, the obligation of

Westlake to complete the RCRA Corrective Measures Work in strict accordance with the terms

of this Consent Decree.

72.    Any and all financial assurance instruments provided pursuant to this Consent

Decree shall be automatically renewed at the time of their expiration unless the financial

assurance provider has notified both Westlake and the Regional Financial Assurance Officer at

least one hundred and twenty (120) days prior to expiration, cancellation or termination of the

instrument of a decision to cancel, terminate or not renew a financial assurance instrument.

Under the terms of the financial assurance instrument, the one hundred and twenty (120) days

shall begin to run on the date of receipt of the notice by both the Regional Financial Assurance

Officer and Westlake.  Furthermore, if Westlake has failed to provide alternate financial

assurance and obtain written approval for such alternate financial assurance within ninety (90)

days following receipt of such notice by both Westlake and the Regional Financial Assurance

Officer, then the Regional Financial Assurance Officer may so notify the financial assurance

provider in writing prior to the expiration of the instrument, and the financial assurance provider

shall immediately deposit into the standby trust fund, or a newly created trust fund approved by

EPA, the remaining funds obligated under the financial assurance instrument for the performance of the RCRA Corrective Measures Work in accordance with this Consent Decree.

    73.   Performance Failure.

        a.    In the event that EPA determines that Westlake (i) has ceased implementation of any portion of the RCRA Corrective Measures Work, (ii) is significantly or repeatedly deficient or late in its performance of the RCRA Corrective Measures Work, or (iii) is implementing the RCRA Corrective Measures Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Performance Failure Notice") to both Westlake and the financial assurance provider of Westlake's failure to perform.  The notice issued by EPA will specify the grounds upon which such a notice was issued and will provide Westlake with a period of ten (10) days within which to remedy the circumstances giving rise to the issuance of such notice.

        b.    Failure by Westlake to remedy the relevant Performance Failure to EPA's satisfaction before the expiration of the ten-day notice period specified herein shall trigger EPA's right to have immediate access to and benefit of the financial assurance provided pursuant to this Consent Decree.  EPA may at any time thereafter direct the financial assurance provider to immediately (i) deposit into the standby trust fund, or a newly created trust fund approved by EPA, the remaining funds obligated under the financial assurance instrument (ii) or arrange for performance of the RCRA Corrective Measures Work in accordance with this Consent Decree.

        c.    If EPA has determined that any of the circumstances described above relating to a performance failure have occurred, and if EPA is nevertheless unable after reasonable efforts to secure the payment of funds or performance of the RCRA Corrective

-58-

Measures Work in accordance with this Consent Decree from the financial assurance provider pursuant to this Consent Decree, then, upon receiving written notice from EPA, Westlake shall within ten (10) days thereafter deposit into the standby trust fund, or a newly created trust fund approved by EPA, in immediately available funds and without setoff, counterclaim, or condition of any kind, a cash amount equal to the estimated cost of the remaining RCRA Corrective Measures Work to be performed in accordance with this Consent Decree as of such date, as determined by EPA.

        d.     Westlake may invoke the procedures set forth in the Dispute Resolution provisions of this Consent Decree to dispute EPA's determination that any of the circumstances concerning performance failure. Invoking the dispute resolution provisions shall not excuse, toll or suspend the obligation of the financial assurance provider to fund the trust fund or perform the RCRA Corrective Measures Work. Furthermore, notwithstanding Westlake's invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion direct the trustee of such trust fund to make payments from the trust fund to any person that has performed the RCRA Corrective Measures Work in accordance with this Consent Decree until the earlier of (i) the date that Westlake remedies, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Performance Failure Notice or (ii) the date that a final decision is rendered in accordance with the Dispute Resolution provisions of this Consent Decree that Westlake has not failed to perform the RCRA Corrective Measures Work in accordance with this Consent Decree.

       74.     <u>Modification of Amount and/or Form of Performance Guarantee.</u>

a.   <u>Reduction of Amount of Financial Assurance</u>.  If Westlake believes that the estimated cost to complete the remaining RCRA Corrective Measures Work has diminished below the amount covered by the existing financial assurance provided under this Consent Decree, Westlake may, at the same time that Westlake submits the annual cost adjustment, or at any other time agreed to by EPA, submit a written proposal to EPA to reduce the amount of the financial assurance provided under this Section so that the amount of the financial assurance is equal to the estimated cost of the remaining RCRA Corrective Measures Work to be performed. The written proposal shall specify, at a minimum, the cost of the remaining RCRA Corrective Measures Work to be performed and the basis upon which such cost was calculated.  In seeking approval of a revised financial assurance amount, Westlake shall follow the procedures set forth herein.  If EPA decides to accept such a proposal, EPA shall notify Westlake of its decision in writing. After receiving EPA's written decision, Westlake may reduce the amount of the financial assurance only in accordance with and to the extent permitted by such written decision.  In the event of a dispute, Westlake may reduce the amount of the financial assurance required hereunder only in accordance with the final EPA decision resolving such dispute.  No change to the form or terms of any financial assurance provided under this Section, other than a reduction in amount, is authorized except as provided in below.

b.   <u>Change of Form of Financial Assurance</u>.

(i)   If Westlake desires to change the form or terms of financial assurance, Westlake may, at the same time that Westlake submits the annual cost adjustment, or at any other time agreed to by EPA, submit a written proposal to EPA to change the form of financial assurance.  The submission of such proposed revised or alternative form of financial

–60–